UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**BRAEDEN BURGE, by and through his
guardian ad litem, KELLY BURGE,**

           Plaintiff,

    v.

**COLTON SCHOOL DISTRICT 53,**

           Defendant.

**Case No. 3:14-00605-ST**

**FINDINGS AND
RECOMMENDATIONS**

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

Plaintiff, Braeden Burge ("Braeden"), alleges claims under 42 USC § 1983 against defendant, Colton School District ("CSD"), for violating his First Amendment right to free speech (First Claim) and his Fourteenth Amendment right to due process (Second Claim) when it punished him for comments he made on his private Facebook page from his own home, outside school hours, and while not participating in any school-sponsored activity. This court has subject matter jurisdiction pursuant to 28 USC § 1331(a).

1 – FINDINGS AND RECOMMENDATIONS

Based on undisputed facts, both parties have filed competing motions for summary judgment (dockets #10 & #12).  For the reasons set forth below, summary judgment should be granted in favor of Braeden on the First Claim and in favor of CSD on the Second Claim.

## STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  FRCP 56(a).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  On a motion for summary judgment, the court "draws all justifiable inferences in favor of the non-moving party."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F3d 1119, 1125 (9th Cir 2014), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

## UNDISPUTED FACTS

On April 12, 2012, Braeden, who was then a 14-year-old eighth-grade student at Colton Middle School ("CMS"), learned that he had received a "C" from his health teacher, Veronica Bouck.  B. Burge Decl. (docket #12), ¶¶ 1-2, 5; Patton Decl. (docket #13), Ex. 1 ("B. Burge Depo."), p. 27.  This upset Braeden who is normally an "A" student.  B. Burge Depo., p. 29; Patton Decl., Ex. 2 ("K. Burge Depo."), p. 25.  Because of the low grade, Braeden's mother grounded him for a portion of the summer.  K. Burge Depo., pp. 31-32.

To vent his frustration, Braeden posted a series of comments on his private Facebook page from his own home on a day that school was not in session.  B. Burge Depo., pp. 26-29.  He posted that he wanted to "start a petition to get mrs. Bouck fired, she's the worst teacher ever."

Mersereau Decl. (docket #11), Ex. 1, p. 1.  After a friend asked "what did [ms. Bouck] do?"

Braedon responded "She's just a bitch haha."  *Id.*  Then his friend wrote "XD HAHAHAHA!!"

and Braeden stated "Ya haha she needs to be shot."  *Id.*  Braeden did not intend to threaten or

otherwise communicate with Bouck and did not seriously believe that Bouck should be shot.

B. Burge Decl. ¶¶ 4-5; B. Burge Depo., pp. 33-34.  Braeden was not even serious about starting a

petition to get Bouck fired.  B. Burge Depo., p. 30.  His only purpose in posting these comments

was "to elicit a response from [his] friends, just to see what they thought about it."  *Id*, p. 29.

Only those Facebook users whom Braeden had confirmed as "friends" would have been

able to view the comments he posted on his Facebook wall.  *Id*, p. 13; B. Burge Decl. ¶ 3.[1]

Braeden is not and has never been Facebook friends with Bouck and did not intend for Bouck to

see his comments about her.  B. Burge Decl. ¶ 4.  When Braeden made the Facebook comments

about Bouck, he was not Facebook friends with any CMS or CSD employee or staff member.

*Id*; Patton Decl., Ex. 5 ("Powell Depo."), p. 45 & Ex. 19.  Because CMS blocks Facebook access

at school, students cannot access Facebook on school computers.  Powell Depo., pp. 82-83.

Braeden's mother monitors each of her children's Facebook pages on a daily basis

because she is Facebook friends with each of them.  K. Burge Depo., p. 24.  She saw Braeden's

comments about Bouck on Facebook less than 24 hours after he posted them.  B. Burge Depo.,

pp. 32-33.  She immediately instructed Braeden to delete the entire post, which he did.  *Id*,

pp. 33, 38; K. Burge Depo., pp. 29-31.

No one heard or said anything about Braeden's April 12, 2012 Facebook comments until

May 29, 2012.  K. Burge Depo., p. 33; B. Burge Depo., pp. 34, 40, 42, 53; Powell Depo., p. 63.

On that day, over six weeks after Braeden had made the post and taken it down, the parent of

---

[1] A Facebook "friend" is a Facebook user that has been allowed access to see another user's Facebook account.  B. Burge Depo., p. 13.

3 – FINDINGS AND RECOMMENDATIONS

another CMS student anonymously placed a printout of Braeden's Facebook post in the school mailbox of CMS's principal, Kara Powell.  Powell Depo., pp. 16-19.  After receiving the printout, Powell had Braeden brought to the school office where she questioned him.  *Id*, pp. 22-23.  Braeden acknowledged that he made the Facebook comments.  *Id*, p. 23; B. Burge, p. 43.  Neither Powell nor the CSD Superintendent, Linda Johnson, investigated whether Braeden had access to or experience with guns, contacted the police, or referred him to a counselor.  Powell Depo., pp. 29, 39-41, 71-72; Patton Decl., Ex. 4 ("Johnson Depo."), pp. 7-8.  Instead, Powell showed some CSD policies to Braeden and gave him a three and one-half day in-school suspension.  Powell Depo., pp. 23-25, 30-31; Patton Decl., Ex. 8.

After deciding to discipline Braeden, Powell called Braeden's parents.  K. Burge Depo., pp. 33-35; Powell Depo., pp. 29-31.  Ms. Burge informed Powell that she was aware of the post, and that she had already talked to Braeden about it.  K. Burge Depo., p. 35.  Ms. Burge also disagreed with the suspension and stated that the school could not discipline one of her children for misconduct that occurred outside of school.  *Id*, pp. 37-38.  Powell suspended Braeden despite Ms. Burge's opposition.  *Id*, p. 35.

Braeden did not have a significant history of disciplinary issues.  Johnson Depo., pp. 8, 19.  According to Powell, Braeden was "respectful . . . and compliant."  Powell Depo., p. 15.  Braeden had never been disciplined before by CMS or CSD for any act of violence and had never been convicted of a juvenile crime of any kind.  B. Burge Depo., pp. 8-9, 18.  Powell did not discuss the Facebook posts with any of Braeden's other teachers and did not investigate whether Braeden had made similar Facebook posts after April 12.  Powell Depo., pp. 55-56, 69.  Bouck did not take off any time from work as a result of Braeden's Facebook posts and did not

discuss the Facebook posts with Braeden or any other students or teachers at CMS.  Patton Decl.,
Ex. 6 ("Bouck Depo."), pp. 22, 25.

After the half-day in-school suspension, Ms. Burge decided to pull Braeden out of school
for the remaining three days of his suspension.  K. Burge Depo., p. 45.  Braeden returned to
classes on June 4, 2012, and completed the last week of eighth grade without incident.  B. Burge
Depo., pp. 50-51; Bouck Depo., pp. 25, 27.  Johnson did not keep Braeden out of Bouck's
classroom the last three days of school which, after initial protest, Bouck accepted.  Johnson
Depo., pp. 21-22.  Braeden also attended a class field trip supervised by Bouck on June 8, 2012,
which was the last day of school before the summer recess.  Patton Decl., Ex. 3 ("Bjarnson
Depo."), pp. 15-16.  Unbeknownst to Braeden, he was followed that day by an educational
assistant, Kellene Bjarnson.  *Id.*  According to Bjarnson, there were no disciplinary problems
involving Braeden on the field trip.  *Id*, pp. 15, 18.

**FINDINGS**

**I.**    ***Monell* Liability**

CSD first seeks summary judgment against both § 1983 claims because it cannot be liable
for violating Braeden's constitutional rights pursuant to *Monell v. Dep't of Social Servs.*, 436 US
658 (1978).  In *Monell*, the Supreme Court held that a municipality may only be liable under
§ 1983 for a constitutional tort in three general ways.  First, a plaintiff can prove that the
employee who deprived him of a constitutional right was acting pursuant to a formal or *de facto*
municipal policy or entrenched custom.  *Gillette v. Delmore*, 979 F2d 1342, 1346 (9th Cir 1992).
Second, the plaintiff can prove that the person was an official with "final policymaking authority"
and the "challenged action itself thus constituted an act of official governmental policy."  *Id.*

Third, a plaintiff can prove that an official with final policymaking authority "ratified" a municipal employee's unconstitutional act. *Id* at 1346-47.

CSD's motion interprets Braeden's allegations as asserting § 1983 claims under *Monell* based on a ratification theory. However, Braeden has clarified that his § 1983 claims are premised on the theory "that a district employee was acting pursuant to an expressly adopted official policy." *Lytle v. Carl*, 382 F3d 978, 982 (9th Cir 2004). When CSD officials suspended Braeden, they were acting pursuant to official school district policies, namely Policies JFCM and JFCM-AR (Threats of Violence), GBNA and GBNA-AR (concerning bullying and intimidation of staff), JG (Student Discipline), and JGD (Suspension), as well as the section of the CMS Student Handbook entitled "Actions Against Other Persons." Patton Decl., ¶ 25; Ex. 10, p. 1 & Exs. 24-25; Powell Depo., pp. 23-25, 27-28; Johnson Depo., p. 5; Suppl. Patton Decl. (docket #22), Ex. 1, p. 22. If Braeden's suspension was issued pursuant to official policies, then CSD is liable for any violation of his constitutional rights as a result of that suspension.

CSD responds that Braeden has no § 1983 claim because Powell merely identified some CSD policies which she believed supported, but did not mandate, Braeden's suspension. In the context of his due process claim, Braeden argues that CSD did not give him sufficient notice that he could be disciplined for his off-campus conduct. CSD believes that Braeden cannot have it both ways. If CSD has a policy that its employees cannot discipline students for off-campus conduct, then CSD should not be liable for the acts of its employees contrary to that policy. Because Braeden has established only that Powell had the discretion to act in a certain way and did so, CSD contends that her discretionary suspension cannot be considered the act of CSD.

However, "*Monell* requires only that the official policy cause the constitutional violation, not that the policy itself be unconstitutional." *McKinley v. City of Eloy*, 705 F2d 1110, 1117 (9th Cir 1983); *Obert v. The Pyramid*, 381 F Supp2d 723, 727 (WD Tenn 2005), citing *City of Canton v. Harris*, 489 US 378, 389 (1989) ("[A] municipality may be liable if an employee's application of an otherwise constitutional policy leads to an unconstitutional result."); *Ramirez v. City of Phoenix*, No. 2:12-cv-00639, 2013 WL 3833061, at *2-3 (D Ariz 2013) (complaint satisfied *Monell* where plaintiff alleged that a city official used a valid city policy "to issue the reprimand in contravention of Ramirez's free speech rights").  In other words, even if the policy is constitutional, a municipal entity may be held liable for its unconstitutional application by its employee.  Granting discretion to the employee does not automatically immunize the municipal entity from a § 1983 claim.

Therefore, CSD's motion for summary judgment based on *Monell* should be denied.

## II.    First Amendment (First Claim)

The First Claim alleges that CSD violated Braeden's First Amendment rights to free expression when they punished him for statements he made while in the privacy of his own home and not participating in any school-sponsored activity.  CSD seeks summary judgment on this claim for several reasons.  First, it argues that Braeden's speech is not protected by the First Amendment because it falls within the "true threat" exception.  Second, CSD may regulate student speech created off-campus if it presents an actual or potential, "material and substantial" disruption of the school environment which, according to CSD, Braeden's speech did.  Braeden, in turn, seeks summary judgment for the opposite reasons.

///

///

7 – FINDINGS AND RECOMMENDATIONS

A.    **True Threat**

The Supreme Court has recognized a narrow "true threat" exception to the First Amendment. *Virginia v. Black*, 538 US 343, 359 (2003). Accordingly, if Braeden's Facebook comments constitute a "true threat," then they receive no First Amendment protection, regardless of where they were made.

Not every off-hand reference to violence is a true threat unprotected by the First Amendment. "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 US at 359. The Ninth Circuit has made it clear that "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." *Fogel v. Collins*, 531 F3d 824, 831 (9th Cir 2008), quoting *United States v. Cassel*, 408 F3d 622, 633 (9th Cir 2005). In addition to the subjective test, an objective test may be applicable in determining if speech is a true threat:

> Because the true threat requirement is imposed by the Constitution, the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech. The difference is that with respect to some threat statutes, we require that the purported threat meet an objective standard *in addition*, and for some we do not.

*United States v. Bagdasarian*, 652 F3d 1113, 1117 (9th Cir 2011).

CSD argues that only the objective test applies in the civil context, citing *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F3d 1062 (9th Cir 2013). However, *Wynar* did not decide whether the statements at issue were true threats or whether only the objective standard applies in cases where the government imposes a civil sanction on an individual based on threatening speech. Furthermore, applying only the objective test is contrary to imposing the subjective standard as

8 – FINDINGS AND RECOMMENDATIONS

the *minimal* standard applicable whenever the government punishes threatening speech.
*Bagdasarian*, 652 F3d at 1117.  Accordingly, if only one standard applies in the civil context, it
is the subjective standard.  The additional objective test may also apply, depending on the statute
or policy under which the speaker has been punished.  *Id.*  Under either test, Braeden's speech
was not a "true threat."

## 1.    Subjective Standard

The subjective requirement of the "true threat" exception to the First Amendment is met
"only if the 'speaker means to communicate a serious expression of an intent to commit an act of
unlawful violence to a particular individual or group of individuals.'  It is therefore not sufficient
that objective observers would reasonably perceive such speech as a threat of injury or death."
*Id* at 1116, quoting *Black*, 538 US at 359.  Thus, "the constitutional inquiry commanded by
*Black*" is this: "Did the speaker subjectively intend the speech as a threat?"  *Id* at 1118.

It is undisputed that when Braeden posted his comments Facebook, he did not intend to
threaten or intimidate Bouck or any other person.  B. Burge Decl., ¶¶ 4-5; B. Burge Depo.,
pp. 27, 29, 33-34.  Indeed, he did not believe Bouck would ever see the comments because he
has never been Facebook friends with her.  B. Burge Decl., ¶ 4.  He intended only to express his
dissatisfaction with his grade and elicit a response from his friends and not to even communicate
with Bouck.  *Id*, ¶¶ 4-5.  For solely this reason, Braeden's Facebook comments were not "true
threats" within the exception to the First Amendment.

## 2.    Objective Standard

The objective test asks whether "a reasonable person would foresee that the statement
would be interpreted by those to whom he communicates the statement as a serious expression of
intent to harm or assault."  *Fogel*, 531 F3d at 831.  This test requires the fact-finder to "'look[] at

the entire factual context of [the] statements including:  the surrounding events, the listeners'

reaction, and whether the words are conditional.'"  *Bagdasarian*, 652 F3d at 1119, quoting

*United States v. Gordon*, 974 F2d 1110, 1117 (9th Cir 1992) (alterations in original).

The anticipated reaction of the intended audience is a key element.  When Braeden

posted his comments, his Facebook page was set to "friends only."  His Facebook friends were

other young people or his family, and not any CMS or CSD employee or staff member.  Thus,

the issue is whether a reasonable person in Braeden's position would foresee that the other

teenagers with whom he was Facebook friends would interpret his comments about Bouck as a

serious expression of intent to harm or assault.  *See*, *e.g.*, *Bagdasarian*, 652 F3d at 1119.  Given

the comments responding to his post, the answer is clearly no.  *See Watts v. United States*, 394

US 705, 706, 708 (1969) (Laughter in response to comments by 18-year-old war protester at a

public rally that "If they ever make me carry a rifle the first man I want to get in my sights is

L.B.J," was a "very crude offensive method of stating a political opposition to the President.").

Braeden initiated the conversation by wishing Bouck would be fired because "she's the worst

teacher ever."  Merserau Decl., Ex. 1.  His friends responded with laughter ("hahahaha") and

contradictory opinions about her teaching.  *Id.*  Braeden's comments, while crude ("She's just a

bitch"), were meant and understood by his audience as a critique of Bouck's teaching skills and

not the serious expression of intent to harm her.

The reactions of Johnson and Powell demonstrate that even they anticipated no violence

from Braeden based on his Facebook comments.  They did not investigate whether Braeden had

access to guns or a history of violence, contact the police or a mental health professional, or even

remove Braeden from Bouck's classroom.  Furthermore, the minor sanction that Johnson

imposed demonstrates that she was not at all concerned with Braeden returning to CMS.  No

evidence supports the conclusion that school officials honestly believed that Braeden's Facebook comments made six weeks earlier were a "serious expression of intent to harm or assault." Although an anonymous parent may have been concerned, Braeden's mother viewed the Facebook post as typical teenage communication.  K. Burge Depo., p. 45; K. Burge Decl. (docket #15), ¶ 3.  In any event, only the anticipated reaction of Braeden's Facebook friends, the intended audience, is relevant under the objective test, not the reaction of the school officials or other parents.

Another key element of the objective test is whether the words themselves constitute a threat within the ordinary meaning of that word.  *Bagdasarian*, 652 F3d at 1119-20.  In *Bagdasarian*, the defendant made some disturbing comments in an Internet chatroom about then-presidential candidate Barack Obama.  He was convicted under 18 USC § 879(a) which makes it a crime to threaten to kill a major presidential candidate.  Applying the objective test, the Ninth Circuit held that Bagdasarian's comments did not constitute "a threat in the ordinary meaning of the word: 'an expression of an intention to inflict * * * injury * * * on another.'"  *Id*, quoting Webster's Third New Int'l Dictionary 2382 (1976).  It explained:

> The "Obama fk the niggar" statement is a prediction that Obama "will have a 50 cal in the head soon."  It conveys no explicit or implicit threat on the part of Bagdasarian that he himself will kill or injure Obama.  Nor does the second statement impart a threat. "[S]hoot the nig" is instead an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration. . . .  It is difficult to see how a rational trier of fact could reasonably have found that either statement, on its face or taken in context, expresses a threat against Obama by Bagdasarian.

*Id.*

Braeden's Facebook comments are tamer and similarly do not constitute a threat within the ordinary meaning of the word.  He did not threaten to shoot Bouck himself, but at most stated "an imperative intended to encourage others to take violent action, if not simply an expression of

rage or frustration."  *Id.*  Thus, Braeden's Facebook comments were not "true threats" under the objective test.

**B.**    **Off-campus Student Speech**

Even if not a "true threat," CSD argues that disciplining Braeden for his Facebook comments did not violate the First Amendment.  Public school students are protected by the First Amendment and do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 US 503, 506 (1969).  However, schools may restrict speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" or that collides "with the rights of other students to be secure and to be let alone."  *Id* at 508, 514.  Since *Tinker*, the Supreme Court has decided three cases governing a different area of student speech:  (1) vulgar, lewd, obscene, and plainly offensive speech occurring on school grounds is governed by *Bethel Sch. Dist. No. 403 v. Fraser*, 478 US 675 (1986); (2) "school-sponsored speech" is governed by *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 US 260 (1988); and (3) the "somewhat unique" category of speech promoting illegal drug use is governed by *Morse v. Frederick*, 551 US 393 (2007).  "Beyond those contexts, the Court has noted only that '[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents.'"  *Wynar*, 728 F3d at 1067, quoting *Morse*, 551 US at 401.

 The Supreme Court has not yet addressed whether *Tinker* governs off-campus speech by students, but other courts have, including the Ninth Circuit in two cases.  However, neither of those cases involves the situation presented here.

In *LaVine v. Blaine Sch. Dist.*, 257 F3d 981 (9th Cir 2001), a student was temporarily expelled because he wrote a first-person poem at home about a school shooting and suicide that

he later showed to his English teacher during class. The Ninth Circuit applied *Tinker* and found that the school could have reasonably "forecast substantial disruption of or material interference with school activities — specifically, that [the student] was intending to inflict injury upon himself or others." *Id* at 990. In contrast, Braeden never intended his comments to be brought to the school and actively took steps to decrease the likelihood that his post would find its way to the school. He set his Facebook privacy settings so that only his Facebook friends could see the comments. He also deleted the Facebook post less than 24 hours after writing it.

More recently in *Wynar*, the Ninth Circuit addressed an "off-campus communication among students involving a safety threat to the school environment and brought to the school's attention by a fellow student, not the speaker." 728 F3d at 1068. Landon, a high school student, "engaged in a string of increasingly violent and threatening instant messages sent from home to his friends bragging about his weapons, threatening to shoot specific classmates, intimating that he would 'take out' other people at a school shooting on a specific date, and invoking the image of the Virginia Tech massacre." *Id* at 1064-65. After his friends notified school authorities, the student was temporarily expelled. The Ninth Circuit concluded that "the location of the speech can make a difference, but that does not mean that all off-campus speech is beyond the reach of school officials." *Id* at 1068. It explained:

> A number of our sister circuits have wrestled with the question of *Tinker*'s reach beyond the schoolyard. The Second, Fourth and Eighth Circuits have concluded that *Tinker* applies to certain off-campus speech. These Circuits have imposed some additional threshold test before applying *Tinker* to speech that originates off campus. For example, the Fourth Circuit requires that the speech have a sufficient "nexus" to the school, while the Eighth Circuit requires that it be "reasonably foreseeable that [the speech] will reach the school community." . . . [A]t least where it is reasonably foreseeable that off-campus speech meeting the *Tinker* test will wind up at school, the Second Circuit has permitted schools to impose discipline based on the speech.

13 – FINDINGS AND RECOMMENDATIONS

> The Third and Fifth Circuits have left open the question
> whether *Tinker* applies to off-campus speech . . . .

*Id* at 1068-69 (citations omitted).

Based on the "myriad of circumstances involving off-campus speech," the Ninth Circuit was "reluctant to try and craft a one-size fits all approach." *Id* at 1069. Instead, it side-stepped the issue by finding no "need to decide whether to incorporate or adopt the threshold tests from our sister circuits, as any of these tests could be easily satisfied." *Id*. It affirmed summary judgment for the school district on the First Amendment claim, explaining:

> Given the subject and addresses of Landon's messages, it is hard to imagine how their nexus to the school could have been more direct; for the same reasons, it should have been reasonably foreseeable to Landon that his messages would reach campus. Indeed, the alarming nature of the messages prompted Landon's friends to do exactly what we would hope any responsible student would do:  report to school authorities.  Here we make explicit what was implicit in *LaVine*:  when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of *Tinker*.

*Id.*

Under *Wynar*, if Braeden's off-campus comments constitute "an identifiable threat of school violence" and would substantially disrupt or materially interfere with school activities, then CSD could discipline him without violating the First Amendment.  The Ninth Circuit did not explain in *Wynar* what constitutes "an identifiable threat of school violence."  As discussed above, Braeden's comments do not rise to the level of a "true threat" that receives no First Amendment protection.  However, the Ninth Circuit appears to allow school authorities the ability to discipline off-campus comments that pose less of a threat as long as they could substantially disrupt or materially interfere with school activities.  Thus, the issue is whether CSD could reasonably conclude that Braeden's Facebook comments "would '*materially and*

*substantially* interfere with the requirements of appropriate discipline in the operation of the school.'" *Tinker*, 393 US at 509 (emphasis added), quoting *Burnside v. Byars*, 363 F2d 744, 749 (5th Cir 1966).

Although an actual disruption is not required, school officials must have more than an "undifferentiated fear or apprehension of disturbance" to overcome the student's right to freedom of expression. *Id* at 508. Other courts have interpreted that the "material and substantial disruption" test from "'*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance.'" *T.V. ex rel. B.V. v. Smith-Green Comm. Sch. Corp.*, 807 F Supp2d 767, 782 (ND Ind 2011), quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F3d 200, 211 (3rd Cir 2001). Relevant factors include "whether school administrators are pulled away from their ordinary tasks to respond to or mitigate the effects of a student's speech." *J.C. v. Beverly Hills Unified Sch. Dist.*, 711 F Supp2d 1094, 1113-14 (CD Cal 2010). Even where "students are discussing the speech at issue," no substantial disruption exists, "at least [when] there is no evidence that classroom activities were substantially disrupted." *Id* at 1111 (citation omitted). In addition, student speech cannot be punished "on the basis of . . . embarrassment to school officials," *Burch v. Barker*, 861 F2d 1149, 1159 (9th Cir 1988), and "it is certainly not enough that the speech is merely offensive to some listener." *Saxe*, 240 F3d at 217.

There is no evidence that Braeden's Facebook post had any impact on classroom activities. It did not cause a widespread whispering campaign at CSM and was not discussed by students at school or anywhere else. B. Burge Depo., pp. 34, 40-47, 53; Bjarnson Depo., p. 17; Johnson Depo., p. 25; Powell Depo., p. 63. When Braeden returned to classes after his suspension, there were no incidents or discussions concerning the Facebook post. In fact, he continued to attend Bouck's class unsupervised and without incident. B. Burge Depo.,

15 – FINDINGS AND RECOMMENDATIONS

pp. 49-50; Bjarnson Depo., p. 15.  No students missed class and no CSD employees, including

Bouck, missed work because of Braeden's Facebook post.  Johnson Depo., pp. 23-24; Bouck

Depo., p. 22.

No school administrators were pulled away from their ordinary tasks in order to respond

to Braeden's Facebook post.  Powell spent approximately one hour dealing with Braeden after

learning of his Facebook post.  Powell Depo., pp. 48-49, 67-68.  All of that time was spent on

tasks that are part of her regular duties as a middle school principal.  *Id*, pp. 7, 49, 68-69.  The

day that Bjarnson, the educational assistant, spent shadowing Braeden was part of her ordinary

duties.  Bjarnson Depo., pp. 8, 11-15.  Finally, Johnson spent just a few hours in total dealing

with Braeden's Facebook post.  Johnson Depo, p. 22.  This does not constitute a "material and

substantial" disruption.  *See J.C.*, 711 F Supp2d at 1117 ("address[ing] the concerns of an upset

parent and a student who temporarily refused to go to class," as well as causing five students to

miss an undetermined portion of one school day did not rise to the level of a substantial

disruption); *see also T.V.*, 807 F Supp2d at 785 ("[T]his case involved two complaints from

parents and some petty sniping among a group of 15 and 16 year olds.  This can't be what the

Supreme Court had in mind when it enunciated the 'substantial disruption' standard in *Tinker*.

To find otherwise would be to read the word 'substantial' out of 'substantial disruption.'");

*Killion v. Franklin Reg. Sch. Dist.*, 136 F Supp2d 446 (WD Pa 2001) (granting summary

judgment to plaintiff on First Amendment claim where two teachers were upset by plaintiff's

rude top-ten list which had been on school grounds for nearly a week without any disruption

before the discipline was imposed).

Of course, school authorities need not wait until an actual disruption of the school

environment occurs.  "*Tinker* does not require certainty that disruption will occur, but rather the

existence of facts which might reasonably lead school officials to forecast substantial disruption." *LaVine*, 257 F3d at 989 (internal quotations marks and citation omitted). However, regulation of student speech must be "based on *evidence* or *facts* indicating a foreseeable risk of disruption, rather than undifferentiated fears or mere disapproval of the speech." *J.C.*, 711 F Supp2d at 1115. In other words, if "a school can point to a well-founded expectation of disruption — especially one based on past incidents arising out of similar speech — the restriction may pass constitutional muster." *Saxe*, 240 F3d at 212.

In *LaVine,* the Ninth Circuit found that the school district reasonably forecast substantial disruption where: (a) the student showed a teacher a violent poem he had written that explicitly described a mass shooting of his classmates and his own suicide; (b) the student had previously discussed his suicidal tendencies with the school counselor; (c) the school was aware that he had been involved in a domestic dispute with his father and had to leave his family home; (d) the school also knew that the student had recently broken up with his girlfriend and had been accused of stalking her; and (e) the student had a prior discipline record at the school, including one act of violence. *LaVine*, 257 F3d at 984, 989-90. Calling this "*a close case in retrospect,*" the court ultimately found that, based on these facts, school officials could reasonably portend substantial disruption and possible violence. *Id* at 983 (emphasis added).

In *Wynar*, Landon's friends were alarmed at his "increasingly violent and threatening instant messages" about his weapons and threatening to shoot specific classmates and others on a specific date and notified school authorities. *Wynar*, 728 F3d at 1064-65. When questioned by the police, Landon confirmed that he had access to weapons and ammunition at his house. *Id* at 1071. On these facts, the Ninth Circuit found that it "was reasonable for Douglas County to interpret the messages as a real risk and to forecast a substantial disruption." *Id* at 1070.

17 – FINDINGS AND RECOMMENDATIONS

The facts in *LaVine* or *Wynar* are easily distinguishable from the facts here.  Braeden's Facebook comments were not explicitly violent and graphic.  Unlike the student in *LaVine*, Braeden has no history of being violent, having emotional problems, or having any serious disciplinary problems while at CMS.  Also, Braeden had never fired a gun and had no access to guns or ammunition.  B. Burge Depo., p. 34.

Of even greater significance, during the six week period before Powell became aware of Braeden's Facebook comments, no one talked about or otherwise acknowledged them.  Braeden continued to attend Bouck's health class and had no disciplinary issues.  Even when Powell learned of them, her conduct evidenced no fear of future substantial disruption or violence.  She did not ask him or his parents if he had access to guns, did not contact the police or have him evaluated by a mental health professional.  Instead, she imposed a sanction that required Braeden to sit for the entire school day in an area in the school office near the teachers' mailboxes.  *See Evans v. Bayer*, 684 F Supp2d 1365, 1376 (SD Fla 2010) (noting that the requirements of *Tinker* were not met where the student's offending Facebook page had already been taken down by the time it was brought to the school principal's attention, such that "the potential spark of disruption had sputtered out, and all that remained was the opportunity to punish.").

In the absence of evidence that Braeden had committed acts of violence in the past, had access to guns, or had any serious discipline problems, no reasonable fact-finder could conclude that Braeden's Facebook comments were reasonably likely to cause the type of future substantial disruption required by *Tinker*.  Thus, even if *Tinker* applies to Braeden's off-campus speech, CSD violated Braeden's First Amendment free speech rights when it suspended him.  Braeden therefore should be granted summary judgment on his First Claim.

///

18 – FINDINGS AND RECOMMENDATIONS

III.    **Fourteenth Amendment (Second Claim)**

Braeden's Second Claim under § 1983 alleges a denial of his due process rights under the Fourteenth Amendment. He seeks summary judgment on this claim because he did not receive fair warning that he could be disciplined for constitutionally-protected comments he posted to Facebook from the privacy of his own home, outside school hours, and while not participating in any school-sponsored activity. CSD, in turn, seeks summary judgment because Braeden was not deprived of any property interest and was not denied any due process.

A.    **Property Interest**

The Fourteenth Amendment forbids the State from depriving "any person of life, liberty, or property, without due process of law." Braeden argues that by failing to give him adequate warning prior to his suspension, CSD deprived him of his property right in educational benefits. A student's right to a public education is a property interest protected by the Due Process Clause. *Goss v. Lopez*, 419 US 565, 576 (1975). Accordingly, a student who has been removed from public school for more than a *de minimis* period can bring a due process claim under § 1983. *Id.*

> The Court's view has been that as long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause. A 10-day suspension from school is not *de minimis* in our view and may not be imposed in complete disregard of the Due Process Clause.
>
> A short suspension is, of course, a far milder deprivation than expulsion. But . . . the total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child.

*Id* (citations omitted).

CSD contends that Braeden's three and a half day in-school suspension was not functionally equivalent to an out-of-school suspension. Braeden served one-half day of his suspension in school before his mother pulled him out of school to serve the balance. During that

19 – FINDINGS AND RECOMMENDATIONS

time, he sat in an office next to Powell's office under adult supervision.  B. Burge Depo., p. 46;

Powell Depo., p. 42.  One of his teachers brought him his weeks' school assignments to work on,

and other teachers were available to assist him with his work.  B. Burge Depo., pp. 45-46, 48;

Powell Depo., pp. 42-43.  According to the Handbook, a student serving an in-school suspension:

> must report to the office at the assigned time with class work to do.
> In-school suspension is a "silent" area; students are allowed one
> bathroom break in the morning and one in the afternoon.  Lunch is
> eaten in the "ISS" area; office staff will send student to get his/her
> lunch prior to other students' lunch times.

Suppl. Patton Decl., Ex. 1, p. 19.

Since Braeden was given schoolwork to do, CSD argues that he was not excluded from

the educational process to the extent required to implicate a due process property interest.

Neither the Ninth Circuit nor this court has addressed whether or when an in-school suspension

amounts to "total exclusion from the educational process for more than a trivial period" as

required by *Goss*.  However, CSD finds support for its position in *Laney v. Farley*, 501 F3d 577

(6th Cir 2007), which held that a one-day, in-school suspension did not deprive the plaintiff of a

property interest.  The Sixth Circuit recognized that "[u]nder certain circumstances, in-school

isolation could well constitute as much deprivation of education as at-home suspension . . . it

would depend on the extent to which the student was deprived of instruction or the opportunity

to learn."  *Id* at 581-82, quoting  *Cole v. Newton Special Mun. Separate Sch. Dist.*, 676 F Supp

749, 751-51 (SD Miss 1987), *aff'd*, 853 F2d 924 (5th Cir 1988) (concluding that the facts were

insufficient to make that determination).  Under Tennessee law, "students assigned to in-school

suspension remain in the school setting and are expressly 'required to complete academic

requirements'" and, thus, are "not denied all educational opportunities, even though they are

removed from their classrooms."  *Id* at 582 (citation omitted).  The Sixth Circuit agreed with the

views of three other courts that "have reached the sensible conclusion that in-school suspensions do not implicate a student's property interest in a public education." *Id*, citing *Wise v. Pea Ridge Sch. Dist.*, 855 F2d 560, 563 n3 (8th Cir 1988) (holding that three-day in-school suspension in a special classroom "does not exclude the student from school and consequently a student's property interest in a public education is not implicated"); *Fenton v. Stear*, 423 F Supp 767, 771-72 (WD Pa 1976) (holding no deprivation of a property interest for a three-day in-school suspension where the student was not deprived of any in-school education); *Dickens v. Johnson Cnty. Bd. of Educ.*, 661 F Supp 155, 159 (ED Tenn 1987) (holding that no property interest was implicated for a "timeout" in a three-sided carton for up to four and a half hours on six consecutive days.).

Other courts have also declined to find a property interest based on similar punishments. *Jones v. Long Cnty. Sch. Dist.*, 2012 WL 3562300, at *5 (SD Ga Aug. 14, 2012) (two-day in-school suspension was not counted as total exclusion from the education process); *Couture v. Bd. of Ed. of Albuquerque Pub. Sch.*, 535 F3d 1243, 1257-58 (10th Cir 2008) (missing 12 hours of class through punishment time-outs is not equivalent to a denial of education). Braeden has cited, and this court has found, no cases to the contrary.

Although Braeden was removed from the classroom, even he concedes that an in-school suspension was preferable to a suspension at home. He had an algebra final exam either that week or the next week and did not get enough time to study. B. Burge Depo., p. 49. Had he remained suspended in school next to Powell's office and not stayed at home, he felt he would have had more time to study and received a higher grade. *Id*, pp. 49, 52. Although this court can conceive of circumstances when an in-school suspension may deprive a student of the property interest he has in his education, this case does not present those circumstances. Because CSD did

not deprive Braeden of any property interest, he does not state a claim under § 1983 for a due

process violation.  Thus, CSD should be granted summary judgment against the Second Claim.[2]

### B.   <u>Denial of Due Process</u>

In the alternative, even if the short in-school suspension deprived Braeden of a property

interest, CSD argues that Braeden received all the procedural due process to which he was

entitled.  For suspensions of 10 days or less, procedural due process requires "that the student be

given oral or written notice of the charges against him and, if he denies them, an explanation of

the evidence the authorities have and an opportunity to present his side of the story.  The Clause

requires at least these rudimentary precautions against unfair or mistaken findings of misconduct

and arbitrary exclusion from school."  *Goss*, 419 US 565, 581.  This means "only that, in being

given an opportunity to explain his version of the facts at this discussion, the student first be told

what he is accused of doing and what the basis of the accusation is."  *Id* at 582.  These notice and

hearing requirements are characterized as "an informal give-and-take between student and

disciplinarian, preferably prior to the suspension."  *Id* at 584.  *Goss* remains the guiding decision

for public school suspensions of ten days or less.  *See e.g.*, *Smith on Behalf of Smith v. Severn*,

129 F3d 419, 428-29 (7th Cir 1997) (affirming three-day suspension where minimal due process

rights described in *Goss* were met); *C.B. By and Through Breeding v. Driscoll*, 82 F3d 383, 388

(11th Cir 1996) (affirming two nine-day suspensions where "rudimentary" requirements of *Goss*

were met).

---

[2] For the same reason, CSD argues, without citing any authority, that Braedon cannot state any § 1983 claim for the denial of his free speech under the First Amendment.  However, the First Amendment, unlike the Fourteenth Amendment, does not require the deprivation of an interest in "life, liberty or property."

Braeden was notified of what he had done and what policies he had violated and offered the opportunity to explain his misconduct.  However, he contends that he was not given "fair notice" that he could be suspended for his off-campus Facebook comments.

Since CSD is entitled to summary judgment against the Second Claim because Braeden was not deprived of any property interest, this court need not decide this alternative issue.

## RECOMMENDATIONS

For the reasons stated above, Defendant's Motion for Summary Judgment (docket #10) should be granted against the Second Claim and denied against the First Claim, and Plaintiff's Cross Motion for Summary Judgment (docket #12) should be granted against the First Claim and denied against the Second Claim.  Accordingly, the court should enter a judgment in favor of plaintiff declaring that defendant's conduct and policies violated plaintiff's First Amendment rights to free speech, directing defendant to remove plaintiff's suspension from his school records and awarding plaintiff his reasonable attorney fees, costs and disbursements pursuant to 42 USC § 1988.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Friday, March 20, 2015.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED  March 3, 2015.

s/  Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

23 – FINDINGS AND RECOMMENDATIONS